UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>　　　　**PLAINTIFF,**<br>　　v.<br>**KRAIG HILL,**<br>　　　　**DEFENDANT.** | Case No. 13-CR-00787-YGR<br><br>**ORDER GRANTING MOTION TO SUPPRESS AND GRANTING MOTION FOR RETURN OF PROPERTY**<br><br>Re: Dkt. No. 22, 24 |

　　　　On December 5, 2013, the government charged defendant Kraig Hill in an indictment for violating Title 18 U.S.C. § 922(g)(1), namely for being a felon in possession of a firearm and ammunition.[1] On March 13, 2014, defendant Kraig Hill filed a Motion to Suppress and a related Motion for Return of Property. (Docket Nos. 22, 24.) Briefing on both is complete. With respect to the former, on March 28, 2014, the government filed a memorandum in opposition. (Docket No. 31.) The defense filed its reply on April 11, 2014 and the government filed its amended sur-reply on April 25, 2014. (Docket Nos. 36, 39.) On May 15, 2014, the Court ordered that an evidentiary hearing on the motion to suppress be conducted to resolve factual disputes.

　　　　The Court conducted an evidentiary hearing on June 18, 23, and 27, 2014. Thereafter, the government filed a supplemental brief on August 15, 2014 and the defense filed a post hearing brief on September 5, 2014.[2] (Docket Nos. 57, 62.) The government filed a final supplemental

---

[1] On August 21, 2014 the government filed a superseding indictment charging another count of a section 922(g)(1) violation for conduct on or about July 9, 2013 near Milpitas, California relating to possession of 50 rounds of Magtech .40 caliber ammunition.

[2] The motion to strike the Declaration of Stephen Light in Support of United States's Opposition to Defendant's Motion to Suppress Evidence (Docket No. 58) is **GRANTED** and any attendant

1  response on September 19, 2014. (Docket No. 64.)

2  The Court has considered all of the filings in this matter, the evidence received, and the post hearing briefing.  The Court has also reviewed independently the transcript of the evidentiary hearing and the video surveillance.   Based on the foregoing, and good cause showing, the Court **FINDS** that the defendant's Fourth Amendment rights were violated in his initial seizure and **GRANTS** in their entirety both the Motion to Suppress and the related Motion for Return of Property.

**I. Background.**

This case arises from an incident which occurred in the early morning hours of November 16, 2013. As detailed below, the defendant in this case was found with a loaded Glock 23 semiautomatic handgun bearing serial number RBE219.

On Saturday night, November 15, 2013, a unit from the Alameda County Sheriff's office was completing an operation to identify sales of liquor to under age individuals. Shortly before midnight the operation came to a close in the parking lot of the Town & Country Liquor Store on E. 14th St. in San Leandro, California. As the deputies were standing in a far section of the parking lot, they observed a gray Mercedes Benz with distinct oversized gold rims and tinted windows drive up to the liquor store. As the vehicle exited the parking lot, it accelerated to a high rate of speed, screeched its wheels, and lost traction slightly. The style of driving caused an immediate reaction from the deputies standing in the lot.

Given the lateness of the hour, the attempt to frequent a liquor store, and the observed manner of driving, two sets of deputies immediately entered their own cars and attempted to locate the driver of the Mercedes Benz. Ultimately, one set of deputies found the vehicle in a covered parking lot of a Budget Inn. The covered parking lot accommodated two rows of cars: one to the

---

argument thereon.  The Court did not review or consider either.  The evidentiary portion of this proceeding closed on June 27, 2014.  The government did not seek, nor did the Court grant, leave to reopen evidence.  The government is hereby warned to avoid such presumptuous conduct in the future.  The Court further notes that the government used a smaller font for footnotes in violation of the Local Rules.  By using the smaller font, the government exceeded the page limits.  Again, leave was not sought, nor granted, to exceed the page limits.  Accordingly, footnotes 10 through 18 are stricken from Docket No. 57 and footnotes 4 and 5 from Docket No. 64 are stricken as being in excess of the page limits accounting for proper page formatting.

United States District Court
Northern District of California

right and one to the left of an extra wide driveway between the two. The vehicle at issue was parked in the third stall in the left row as one drove into the garage.

During the evidentiary hearing, deputy sheriff Scheuller and his partner Miguel testified about the search for the vehicle and its discovery at the Budget Inn. Unbeknownst to the witnesses, the defense had secured video coverage from a surveillance camera located in the garage with which the defense later impeached the deputies' testimony. The Court recounts the salient testimony, pre and post impeachment:

Deputy sheriff Scheuller testified that once out of his vehicle at the Budget Inn, he slowly approached the Mercedes Benz and was able to see two people sitting therein. He then saw the defendant turn and reach quickly into the back seat. At this point, he quickly approached the vehicle, open the door and ordered the defendant out. He stated that for officer safety reasons, he wanted to detain the driver as quickly as possible. He did not secure the vehicle, as the driver was his primary concern and he believed that his partner, deputy Miguel was contacting the passenger.

Scheuller handcuffed the defendant and asked him for identification which the defendant indicated was in his breast pocket. The deputy checked the pocket and located an identification card. Scheuller then asked a series of questions because he believed that while there was a similar likeness in the picture, he was not convinced that the card was the defendant's. During Scheuller's questioning of the defendant, Detective Petrini arrived. Petrini walked past Scheuller and looked into the car. Upon looking into the back seat with his flashlight, Petrini saw a gun, yelled a warning, and pulled out his own gun. Scheuller did not. Rather, he moved the defendant and searched for another identification card which he found. At some point thereafter, deputy sheriff Miguel ran the identification through dispatch, and found that the defendant was subject to a four–way search clause.

After lengthy and detailed questioning by both sides, Scheuller testified that he did not have a distinct memory of any specific conversations. However, and of critical importance, he also testified that he had a distinct memory of the events. This was in response to the Court's own questioning for which Scheuller offered no qualification:

3

1      Q: Do you have a distinct memory of this incident? Or are you just basing your testimony

2         on the --on reviewing the police report in preparation?

3      A: I have a distinct memory of this incident.

Transcript at 103:14-18. His tone with respect to all portions of his testimony displayed confidence without any measure of hesitation as to the accuracy of his statements.[3]

Next, deputy Miguel testified. He claimed that upon leaving the patrol car, he approached the passenger side of the vehicle and did so with heighten senses. He claimed to be concerned for his safety because "hands kill." (Transcript at 140:11-141:6.) He recalled entering the proverbial "fatal funnel," that is, an area that is small and lacks adequate cover. (*Id*. at 141:16-20.) He asked the female passenger to exit the car and provide identification which she did. Despite his concerns, did not draw his gun, handcuff the female passenger, or otherwise check the vehicle. His intent was to check the vehicle after he finished with the passenger.

With respect to Detective Petrini, Miguel testified that he arrived during the course of the incident. First, Petrini approached the driver side and then moved to the passenger side. Almost immediately thereafter, Miguel heard Petrini yell about a firearm and saw him withdraw his sidearm. Once Miguel secured the passenger, he opened the back, passenger-side door and found a black semiautomatic Glock on the right rear seat. The firearm was made safe and the magazine removed. The magazine held a capacity of 10 rounds.

The last witness, Detective Petrini, a 15-year veteran, testified that he arrived on the scene after Scheuller and Miguel, entered the garage, and used his flashlight to illuminate the inside of the vehicle. He confirmed that he would not have been able to see inside the vehicle without the additional light. As a field training officer, Detective Petrini observed that the officers had parked in a tactically poor position. When he saw the gun inside the car, he yelled the same to his colleagues and drew his weapon until the female passenger was secure. He testified that the

---

[3] Deputy Scheuller also testified that he found money in the defendant's pocket after the gun was located. Transcript at 91:91:6-8. More precisely, $2,471 was found in the defendant's pocket. There is no dispute as to these facts which are subject to the Motion to Return of Property. (Docket No. 24.) Accordingly, the Court did not order an evidentiary hearing with respect to this issue.

4

1  response was appropriate because the passenger may have lunged or had a weapon. Once the
2  female passenger was handcuffed, he re-holstered his firearm. His gun was out for only 5 to 10
3  seconds. He also chastised Miguel for not having a flashlight.
4      In support of its motion, the defense, in its own case, offered the surveillance video. The
5  real-time video showed both consistencies and inconsistencies with respect to the sworn testimony
6  of the specific details of the encounter.  The Court recounts here only a couple, namely the use of
7  the emergency lights and the location of the police car relative to the Mercedes Benz.  Deputy
8  Scheuller's pre-video testimony about the emergency lights was particularly specific:
9      Q:  And you testified that ...when you use the lights, it creates the desired effect; right?
10     A: Yes.
11     Q. And what is that desired effect?
12     A. So it alerts our to [sic] presence.
13     Q. And so you did want to do that here; correct?
14     A. Not necessarily.  I mean, that's not -- that isn't necessarily the case, that we didn't want
15     to.  We -- I chose not to.
16     Q. Okay. And so you didn't turn the lights on?
17     A.  And I -- no, I didn't.  And I -- partially it's because of the position that the -- that my
18     vehicle was in was in [sic] somewhat of a compromising position.  It's not what we would
19     consider a routine traffic stop type of a configuration, where if we were and his vehicle
20     was in front of mine, I certainly would have used my lights to alert to our presence.  But
21     because we didn't notice that car until we were directly behind it, I'm already in a, in a
22     compromising position with my driver's side being to that vehicle, which is not a
23     traditional traffic stop configuration and it puts -- it puts our officer safety at risk.
24 Transcript at 81:9-82:4.  Despite this testimony, the video showed the unmistakable use of
25 emergency lights which were both bright and flashing.
26     Both deputy sheriffs similarly embellished with respect to the positioning of the vehicles.
27 As an example, Scheuller testified without reservation: "Yes, there was quite a bit of space
28 between my car and the Mercedes.   There was -- there was clearly enough space for a vehicle to

1   travel in between us." *Id.* at 37:21-23.  And, Miguel testified:

2       Q: Okay. And your declaration says that you were not blocking it in.  Is that correct?

3       A: That is correct.

4       Q. According to your declaration the Mercedes could have backed out of the parking stall.

5       A. Yes.

6       Q. And according to your declaration there was enough space so the car could have

7       actually, if you had allowed it, just driven out of the parking lot.

8       A. Yep.

Transcript at 175:4-13.  The colloquy continues at great length as Miguel expounds with particularity on the issue.  Again, the events as shown on the video surveillance are directly contrary.  Given the closeness of the vehicles, the Mercedes Benz could not have exited the spot with sufficient and reasonable clearance to avoid hitting the patrol car.  Any argument to the contrary is, at best, academic.

## II. Motion to Suppress.

### A.  Framework

The defense brings a motion to suppress on the following grounds: First, the defendant argues that the government's initial seizure of him was not lawful and that the subsequent seizure and recovery of evidence was not reasonable under the circumstances.  Second, he argues that the government has failed to establish that the inevitable discovery exception applies.  As part of this second argument, the defense claims that the deputies are not credible and that the initial handcuffing Mr. Hill violated the Fourth Amendment.  The government disagrees asserting that each of the steps described were performed within the relevant constitutional parameters.

The constitutional issues relating to this dispute are well-established and not reasonably in dispute.

> The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. Under *Terry*[4] and its progeny, police may, consistent with the Fourth

---

[4] *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d. 889 (1968).

6

Amendment, stop persons in the absence of probable cause under limited circumstances. *See Dunaway v. New York,* 442 U.S. 200, 207–11, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In particular, law enforcement officers may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity. *See United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Hartz,* 458 F.3d 1011, 1017 (9th Cir.2006); *United States v. Sigmond–Ballesteros,* 285 F.3d 1117, 1121–22 (9th Cir.2002). However, the governmental interest in investigating possible criminal conduct based on an officer's reasonable suspicion may be outweighed by the Fourth Amendment interest of the driver in remaining secure from the intrusion. *See Delaware v. Prouse,* 440 U.S. 648, 654–55, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

*United States v. Grigg,* 498 F.3d 1070, 1074-75 (9th Cir. 2007).  Thus, the issue at hand turns on the Court's evaluation of the "reasonable suspicion" articulated here.

Critical to the Court's evaluation of the instant motion is the fundamental purpose of the exclusionary rule which the Ninth Circuit recently affirmed:

While the Supreme Court has articulated various rationales for the exclusionary rule, the rule's primary purpose has been to deter law enforcement from carrying out unconstitutional searches and seizures. Although the exclusionary rule is often framed as a nuisance to law enforcement, we view it as a promoter of police professionalism and education. *See Herring v. United States,* 555 U.S. 135, 156 n. 6, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) (Ginsburg, J., dissenting) (noting that "professionalism is a sign of the exclusionary rule's efficacy...."). The exclusionary rule has helped police more effectively secure good evidence without violating the law and the rights of American citizens. *See, e.g.,* Myron Orfield, *The Exclusionary Rule and Deterrence: An Empirical Study of Chicago Narcotics Officers,* 54 U. Chi. L.Rev. 1016, 1036–40 (Summer 1987); Stephen H. Sachs, *The Exclusionary Rule: A Prosecutor's Defense,* 1 Crim. Just. Ethics 28, 31–32 (1982). The rule has also improved the quality of police training, education, and case reporting. *See* Wayne LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 1.2(b) at 33 (4th ed.2004); Yale Kamisar, *Public Safety v. Individual Liberties: Some "Facts" and "Theories",* 53 J.Crim. L. Criminology & Police Sci. 171, 179–81 (1962); Orfield, *supra,* at 1028, 1040; Sachs, *supra,* at 31–32.

*United States v. Underwood*, 725 F.3d 1076, 1084-85 (9th Cir. 2013).[5]  As stated, the rule not only exists to improve and monitor the interaction between law enforcement and the public but the reporting of these events in courts of law.

---

[5] *Underwood* does discuss a "good faith exception" (*id*.) but the exception does not apply here as the credibility determination focuses on the officers' own choice to testify in the manner wholly inconsistent with their true and accurate recollection.

As applied here, the Court discounts the entirety of the deputy Scheuller's and Miguel's testimony because of the cavalier and over-reaching approach they employed in testifying. Due to the number and quality of the inconsistencies in the witnesses' testimony, and the surrounding circumstances including that the precipitating event was a completed traffic violation with no immediate threat to the public shown or apparent, the Court does not find credible the testimony suggesting that the defendant's movement to the backseat of the Mercedes Benz was "furtive," and thus, a reasonable basis for the defendant's seizure. The fact that a firearm was later found is not relevant to the analysis.

The Court finds that deputies Scheuller and Miguel each chose to engage in an elaborate explanation of certain events of the night rather than just testify to what they remembered, including, perhaps, an honest and understandable statement regarding the lack of memory as to many details. Had they been honest and not attempted to bolster their own credibility, the Court might have agreed that the testimony, which was so resoundingly contradicted by the video, was ancillary to the key events. However, such was not the case. An officer cannot have a "distinct memory," testify adamantly *without reservation* that he "chose not to" use emergency lights for a particular strategic reason, and then expect a Court to believe him when incontrovertible evidence proves he did not so act. Nor can he provide prolonged, detailed testimony regarding the location of the vehicles in use that night, which is then shown to be false, and expect a Court to believe him to be trustworthy and fully honest as it relates to other details.

The Court has additional concerns that the deputies were attempting to fashion their testimony to fit precisely within some understanding of the factors courts frequently consider with these motions. For instance, the deputies' repeated pre-impeachment claims that the defendant "was not blocked in" (and therefore could have left) suggests that they may have some understanding of the considerations courts use when evaluating custodial detentions. Similarly, in their testimony the deputies used buzz words like "furtive" and "concern for safety" rather than

8

focus on the specific facts that might lead a court to conclude the same. The notion that deputy Miguel could be "concerned" and on "heighten" alert and then loiter around the vehicles, as shown on the video, begs the question and reaffirms that the testimony was not genuine but rather an after-the-fact pronouncement.

Law enforcement officers must understand that their duty to tell the truth includes a duty *not* to embellish; *not* to portend confidence as to details, when such confidence does not genuinely exist; and *not* to swear that testimony is based on distinct memories where, in fact, it is assumed based upon custom and practice. On redirect, only after faced with video coverage demonstrating conflicts with their testimony, did the deputies become much more sanguine about their respective memories. Their reflection came too late. To sanction such testimony condones conduct which should have never occurred and which should not be encouraged. It is only through the granting of these motions that the government will ensure that line officers understand the limits of their authority and duties affiliated with their office. On these bases, the Court finds that the defendant's Fourth Amendment rights were violated when he was removed from his vehicle as an unreasonable seizure.

The Court next addresses the government's argument that the inevitability doctrine applies. Here, the Court finds that the government has not shown that it was inevitable that the firearm would have been found had the initial removal of the defendant not occurred. *United States v. Young*, 573 F.3d 711, 721 (9th Cir. 2009). Rather the evidence is to the contrary. In this context, the Court considers the events as if the defendant had remained in his vehicle as was constitutionally required. First, under these circumstances, there was no independent reason shown for the defendant to have been removed. The original concern was that the driver was driving dangerously, potentially under the influence, and thus, a public safety concern. However, there is no indication that the defendant was under the influence and the vehicle was parked and presumably turned off. There was no evidence that under these circumstances the defendant

9

would have been removed from the vehicle.

Second, as cover to Scheuller, the evidence does not support a finding that Miguel would have found the firearm on his own while covering on the passenger side of the car. He did not have a flashlight, and as confirmed by Detective Petrini, would not have been able to see inside the vehicle without one. Third, it is not clear that Miguel would have even entered the "fatal funnel" if covering for Scheuller while Scheuller asked questions of the defendant from the driver's side door. Fourth, given the delay in Detective Petrini's arrival, there is no evidence that he would have peered with his flashlight into the vehicle or that the detention would have lasted that long. Finally, with respect to the occupants' search clauses, the government did not proffer any evidence of pattern or practice with respect to using those clauses as a basis for searching vehicles during traffic stops and the Court will not infer such evidence.

Because the Court finds that he evidence is insufficient to support removal of the defendant from his vehicle, and that the government has also failed in its burden to show evitable discovery, all evidence obtained was as a result of the initial constitutional violation, and therefore, must be suppressed. The Motion to Suppress is **GRANTED** in its entirety.

For similar reasons, no basis exits for the government's initial discovery and subsequent retention of the currency found on the defendant, and therefore, it must be returned. In light of this finding, the Court need not address the government's other arguments which are premised on the notion that the currency was lawfully obtained. The Motion for Return of Property is **GRANTED**. This terminates Docket Nos. 22 and 24.

**IT IS SO ORDERED**.

Dated: November 5, 2014

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**

10